**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

TAEJ'ON VEGA,

                             Plaintiff,                    9:21-cv-788 (BKS/DJS)

v.

BROOME COUNTY, RICHARD HREBIN, COREY
FOWLER, and DANIEL WEIR,

                             Defendants.

**Appearances:**

*For Plaintiff:*
Joshua T. Cotter
Samuel C. Young
Legal Services of Central New York
221 South Warren Street, Suite 300
Syracuse, New York 13202

*For Defendants:*
Robert G. Behnke
Broome County Attorney
Jennifer L. Church
Joshua T. Terrell
Assistant County Attorneys II
Broome County Attorney's Office
P.O. Box 1766
60 Hawley Street
Binghamton, New York 13902

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.      INTRODUCTION

Plaintiff Taej'on Vega brings this action under 42 U.S.C. § 1983 and New York law

against Defendants Broome County, Richard Hrebin, Corey Fowler, and Daniel Weir asserting

violations stemming from an alleged use of excessive force and unreasonable search on February

10, 2020, when Plaintiff was a pre-trial detainee at Broome County Correctional Facility (the "Facility"). (Dkt. No. 1.) The complaint contains six causes of action: (1) excessive force in violation of the Fourteenth Amendment against Defendants Hrebin and Fowler; (2) unreasonable search in violation of the Fourth Amendment against Defendants Hrebin, Fowler, and Weir; (3) state-law battery against all Defendants; (4) state-law assault against all Defendants; (5) state-law intentional infliction of emotional distress against all Defendants; and (6) negligent supervision and training against Defendant Broome County. (*Id.* ¶¶ 40–63.) Presently before the Court are Plaintiff's motion for sanctions for spoliation of evidence, (Dkt. No. 30), and Defendants' motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, (Dkt. No. 31). Each motion is fully briefed, (Dkt. Nos. 32, 33, 34, 36), and Defendants submitted a supplemental letter-brief at the direction of the Court to address issues raised by Plaintiff's motion for sanctions, (Dkt. No. 40). For the reasons that follow, Plaintiff's motion for sanctions is granted in part and denied in part and Defendants' motion for summary judgment is granted in part and denied in part.

## II.  FACTS

### A.  The February 10, 2020, Incident[1]

On February 10, 2020, Plaintiff was incarcerated at the Facility. (Dkt. No. 31-10, at 33–34.) At approximately 5:30 p.m., Facility personnel conducted a planned housing unit search known as a "SERT shakedown." (Dkt. No. 33-1, ¶ 25.) The goal of a SERT shakedown is to

---

[1] These facts and the facts relevant to Plaintiff's grievance are drawn from Defendants' Statement of Undisputed Material Facts, (Dkt. No. 31-6), Plaintiff's Response to Defendants' Statement of Material Facts, (Dkt. No. 33-1), and Plaintiff's Counterstatement of Additional Material Facts, (*id.*), to the extent they are well-supported by pinpoint citations, as well as exhibits attached thereto. The Court will not consider exhibits attached to Plaintiff's motion for sanctions, (Dkt. No. 30), or Defendants' opposition to Plaintiff's motion for sanctions, (Dkt. No. 32), in connection with Defendants' motion for summary judgment. The facts are undisputed unless otherwise noted. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007). The Court limits its consideration of Defendants' motion for summary judgment to these facts and, to the extent they are relevant, considers these facts in deciding Plaintiff's motion for sanctions.

locate contraband in housing units. (*Id.*) As part of a SERT shakedown, every inmate is told to

get on the ground, handcuffed, and brought to his cell to be strip searched and for the cell to be

searched. (*Id.*) During the SERT shakedown on February 10, 2020, Plaintiff admitted he talked

with inmates, made sarcastic remarks, and laughed at officers and continued to do so even after

officers repeatedly ordered him to be quiet during the SERT shakedown. (*Id.* ¶ 28.) The parties

dispute whether Plaintiff resisted being handcuffed.[2] Defendants Hrebin and Fowler testified that

Plaintiff refused to "give up his hands" to be handcuffed. (Dkt. No. 31-6, ¶ 31; Dkt. No. 31-12, at

33; Dkt. No. 31-13, at 22.) Plaintiff testified that he did not refuse to give up his hands to be

handcuffed. (Dkt. No. 33-1, ¶ 31; Dkt. No. 31-10, at 45; Dkt. No. 35, ex. B at 7:45–8:02.) Capt.

Stanton and Grievance Officer Valls also stated that Plaintiff "tried to move away . . . by sliding

his face back and forth on the carpet." (Dkt. No. 31-4, ¶ 8; Dkt. No. 31-5, ¶ 6.) Plaintiff denies

---

[2] Plaintiff argues that under the "best evidence rule," Grievance Officer Adam Valls and Captain David Stanton's descriptions, in their affidavits, of videos from Defendant Weir's body camera, a handheld SERT camera, and housing unit surveillance cameras allegedly showing Plaintiff's noncompliance during the shakedown "cannot be used to prove the contents of the videos." (Dkt. No. 33-2, ¶ 55 (citing Fed. R. Evid. 1002).) The Court agrees. Federal Rule of Evidence 1002 requires "[a]n original . . . recording . . . in order to prove its content" unless the original was destroyed or another Rule of Evidence provides otherwise. *See* Fed. R. Evid. 1002, 1004; *see also Gaft v. Mitsubishi Motor Credit of Am.*, No. 07-cv-527, 2009 WL 3148764, at *4, 2009 U.S. Dist. LEXIS 91052, at *12 (E.D.N.Y. Sept. 29, 2009) (disregarding statements made in the defendant's counsel's affidavit, submitted in support of a motion for summary judgment, concerning the content of a report because the statements were inadmissible evidence barred by Rule 1002); *New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 423, 428 (S.D.N.Y. 2000) (disregarding, a witness's affidavit, submitted in support of a motion for summary judgment, concerning the contents of certain letters "because the letters themselves are the best evidence of their contents"). As discussed below with respect to Plaintiff's motion for sanctions, the Court will not consider evidence related to the spoliated body-camera video. *See infra* Section III. Furthermore, the handheld SERT video and the surveillance videos were not unavailable; in fact, both parties were in possession of them. (Dkt. No. 32, ¶ 3.) Thus, the Court disregards the SERT camera video and housing unit surveillance from February 10, 2020 and statements made by Capt. Carlson about the content of the handheld SERT video and the surveillance videos in deciding Defendants' motion for summary judgment. Neither will the Court consider Capt. Carlson's statement about the recording of a video call between Plaintiff and his mother on February 12, 2020, (Dkt. No. 31-4, ¶ 6), because that video is not in the record and Defendants have not shown that that video is unavailable. *See* Fed. R. Evid. 1002, 1004; *see also Gaft*, 2009 WL 3148764, at *4 n.4, 2009 U.S. Dist. LEXIS 91052, at *12 n.4. And while Defendants did ultimately submit the handheld SERT video and the surveillance videos in reply to Plaintiff's opposition to Defendants' motion for summary judgment, (Dkt. No. 36, ¶¶ 2, 4; Dkt. No. 37), "[i]t is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden," *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010) (collecting cases). In any event, there are, as discussed below, genuine issues of material fact as to Plaintiff's alleged noncompliance and the events that took place in Plaintiff's cell that the videos would not resolve.

this. (Dkt. No. 35, ex. B at 9:50–10:57.) Defendant Hrebin handcuffed Plaintiff with his hands behind his back while both Defendant Hrebin and Defendant Fowler applied a "mandibular pressure point." (Dkt. No. 33-1, ¶ 33; Dkt. No. 31-12, at 33–34; Dkt. No. 31-13, at 22–23.) After Plaintiff was handcuffed, and at the instruction of Defendant Weir, Defendants Hrebin and Fowler escorted Plaintiff to his cell. (Dkt. No. 31-12, at 34–35; Dkt. No. 31-13, at 24; Dkt. No. 31-11, at 27.)

Before Plaintiff entered his cell, he did not have any visible injuries, (Dkt. No. 31-12, at 33; Dkt. No. 31-13, at 26–27), though Plaintiff hit the top of his head on the door of his cell while entering the cell, (Dkt. No. 31-9, at 27; Dkt. No. 34-4, ¶ 9; Dkt. No. 31-5, ¶ 7). Both Defendant Hrebin and Defendant Fowler were present with Plaintiff in Plaintiff's cell, (Dkt. No. 31-12, at 35; Dkt. No. 31-13, at 24), and Plaintiff was compliant with Defendants Hrebin and Fowler while in the cell, (Dkt. No. 33-1, ¶ 42). Defendants Hrebin and Fowler searched Plaintiff's cell and Defendant Hrebin conducted a strip search of Plaintiff. (*Id.* ¶ 37; Dkt. No. 31-12, at 36–37; Dkt. No. 31-13, at 24–25.)

The remainder of the events in Plaintiff's cell are disputed: Plaintiff testified that, while he was handcuffed, Defendants Hrebin and Fowler hit him in the ribs and face, slapped him, threw him on the bed, punched him in the back, grabbed his chest, choked him, and called him racial slurs. (Dkt. No. 31-9, at 27–28; Dkt. No. 31-10, at 50–5, 55–56; Dkt. No. 31-15, at 1; Dkt. No. 35, ex. B at 12:10–21:00.) Plaintiff testified that he sustained scratches and bruises as a result of the incident. (Dkt. No. 31-9, at 52–54; Dkt. No. 31-10, at 79–80.) Defendants Hrebin and Fowler deny using any force on Plaintiff while in his cell. (Dkt. No. 31-12, at 38; Dkt. No. 31-13, at 26–27; Dkt. No. 31-2, ¶ 4; Dkt. No. 31-3, ¶ 4.)

Defendant Weir, who was wearing a body camera for the duration of the SERT shakedown, testified that he stopped by Plaintiff's cell and "observed [Plaintiff] facing the wall while they were searching his cell." (Dkt. No. 31-11, at 29.) Defendant Weir testified that Plaintiff "wasn't complaining" or "saying anything," so Defendant Weir "waited for a moment and continued on with [his] duties." (*Id.* at 29–31, 33–34.) The parties dispute whether any noise of distress came from Plaintiff's cell while he and Defendants Hrebin and Fowler were in it with Plaintiff. Defendant Weir testified that he did not hear any noises coming from Plaintiff's cell when Defendant Weir was in the middle of the housing unit. (Dkt. No. 31-11, at 28-29.) Plaintiff submitted statements from two inmates: one inmate stated that he heard "crys [sic] of agony" from Plaintiff's cell and "contact sounds that sounded like punches"; another inmate stated that he "heard what sounded like the officers beating on" Plaintiff. (Dkt. No. 33-3, at 2–4.) Plaintiff testified that the time between the time he got off the floor until the time all Defendants left his cell was approximately five to six minutes. (Dkt. No. 33-1, ¶ 49.)

Plaintiff has submitted a video call between Plaintiff and his mother in which bruises or scratches are visible on Plaintiff's face, neck, arms, chest, and back at about 8:30 p.m. the night of the incident. (Dkt. No. 35, ex. C.) Plaintiff did not tell anyone in the Facility about the incident until around 11:30 p.m. on the night of incident. (Dkt. No. 31-9, at 46.) Plaintiff admits that he told a corrections officer about either "coughing up blood" or "urinating blood" in order be seen by Facility medical personnel. (*Id.* at 46–47; Dkt. No. 31-1, at 71.) The medical records from about 8:00 a.m. the next day state that Plaintiff had "multiple linear abrasions" on his chest and the right side of his neck, a "circular abrasion and slight bruising" on the left side of his face, and "two circular superficial abrasions on mid thoracic back." (Dkt. No. 31-15, at 7.) Medical records from approximately 1:30 p.m. that same day note the scratches were "in a very odd

pattern" and were "questionable [as if] self inflicted." (*Id.* at 8.) The medical records note that

the scratches appeared to be from fingernails, (*id.*), and Defendants Hrebin and Fowler were

wearing gloves during the incident, (Dkt. No. 31-10, at 43, 63). The medical records reflect that

Plaintiff pointed to "a bruise approximately 1 inch on the right temple which [wa]s not swollen

and blueish/brown." (Dkt. No. 31-15, at 8.)

### B.      Plaintiff's Grievance

Plaintiff received "an inmate handbook" when he entered the Facility, (Dkt. No. 31-6,

¶ 53; Dkt. No. 31-10, at 34), and filed a grievance about the incident on February 12, 2020, two

days after the incident, (Dkt. No. 31-15, at 1, 12). Plaintiff wrote in the grievance that two

corrections officers "took me in my cell . . . handcuffed and closed the door behind them and

said rac[ia]l slurs and ass[au]lted me and I have bruises on my body." (*Id.* at 1.) Plaintiff

requested an investigation, including an interview of Plaintiff, and indicated he had a lawyer to

file a lawsuit. (*Id.*) The grievance coordinator reviewed "video of the incident," supplementary

reports from Defendants Hrebin, Fowler, and Weir, and a medical log. (*Id.* at 5.) The grievance

coordinator issued a written determination denying the grievance on the merits on February 14,

2020. (*Id.* at 1–9, 12.) Plaintiff appealed this determination to the Chief Administrative Officer

on February 14, 2020. (*Id.* at 10, 12.) Plaintiff was interviewed on February 19, 2020. (Dkt. No.

35, ex. B at 0:10–0:26.) The Chief Administrative Officer issued a determination on February 20,

2020, noting that he "accepted the requested action." (Dkt. No. 31-15, at 10–12.) The Chief

Administrative Officer noted that Plaintiff's "request for an investigation has been granted and

one is ongoing . . . You have been interviewed by the supervisor of the investigation unit. No

further action at this time." On February 21, 2020, Plaintiff "agree[d] to accept the decision."

(*Id.*) Plaintiff filed this action on July 10, 2021. (Dkt. No. 1.)

C.     **The Body-Camera Video[3]**

Sergeants at the Facility wear body cameras during SERT shakedowns. (Dkt. No. 31-11, at 20–21.) The body cameras are activated for the SERT shakedowns. (*Id.* at 22.) Defendant Weir, as a sergeant, wore a body camera during the SERT shakedown on February 10, 2020. (*Id.* at 21–22, 29.) His role was to oversee the SERT shakedown. (*Id.* at 20.) Defendant Weir can be seen patrolling all areas of the housing unit during the SERT shakedown. (Dkt. No. 37, ex. A, at 17:19:37–17:54:33.) Shortly after Defendants Hrebin and Fowler brought Plaintiff to his cell, Defendant Weir walked to the door of the cell and used the body camera to record the inside of the cell for approximately eight seconds while Plaintiff and Defendants Hrebin and Fowler were in it. (Dkt. No. 31-11, at 29–31; Dkt. No. 37, ex. A at 17:23:20–17:23:28.) Defendant Weir submitted the body-camera video to an online storage system, Evidence.com, by docking his body camera after his shift, and the body-camera video was uploaded to the system that day. (Dkt. No. 32-3, at 1; Dkt. No. 32-4, at 9; Dkt. No. 31-11, at 23.)

The body-camera video was not preserved, but testimony and affidavits provided by Defendants do not provide a clear picture of how exactly the video was deleted. On February 11, 2020, the Broome County body-camera supervisor, Captain Paul Carlson, (Dkt. No. 32-1, ¶ 2), viewed the body-camera video and subsequently added then, seconds later, removed a "marker" from the online storage system.[4] (Dkt. No. 32-1, ¶ 3 ; Dkt. No. 32-3, at 1–2.) Capt. Carlson was aware that the body-camera video was relevant to the Facility's investigation into Plaintiff's grievance. (Dkt. No. 32-1, ¶ 9.) Grievance Officer Valls also claims to have viewed the body-

---

[3] These facts are drawn from exhibits attached to Plaintiff's motion for sanctions, (Dkt. No. 30), and Defendants' opposition to Plaintiff's motion for sanctions, (Dkt. No. 32), as well as exhibits attached to Defendants' motion for summary judgment, (Dkt. No. 31), Plaintiff's opposition to Defendants' motion for summary judgment, (Dkt. No. 33), and Defendants' reply, (Dkt. No. 36). The Court considers these facts in deciding Plaintiff's motion for sanctions but not in deciding Defendants' motion for summary judgment.

[4] The record does not indicate what a "marker" is or the significance of Capt. Carlson adding and removing a "marker."

camera video at some point before denying Plaintiff's grievance on February 14, 2020, (Dkt. No. 31-5, ¶¶ 3–4), although the Evidence.com audit log shows no indication that Grievance Officer Valls viewed the body-camera video, and up to that point, no one had attempted to download it, (Dkt. No. 32-3). Capt. Carlson initiated a download of the body-camera video to his computer on February 19, 2020, and attempted to save the body-camera video to the H-drive of his computer. (Dkt. No. 32-1, ¶¶ 7–8; Dkt. No. 32-3, at 2–3.)

Based on affidavits from Karen Andrews, Assistant Director of the Broome County Department of Information and Technology, and Lt. Benjamin Harting, the system administrator of Evidence.com for the Broome County Sheriff's Office: Patrol Division, the body-camera video could not have been downloaded from the online storage system to the location to which Capt. Carlson asserts he downloaded it—the "H-drive"— because "[a]ny data being downloaded from Evidence.com cannot be downloaded to . . . a network drive; it will only download to a hard drive of a computer," and the "H: drive is a network share . . . as opposed to the individual computer's hard drive." (Dkt. No. 30-11, ¶ 6; Dkt. No. 32-1, ¶ 8; Dkt. No. 32-2, ¶ 5.) Capt. Carlson claims, however, that he did download the video to the "H-drive of [his] personal computer," and Lt. Harting similarly states that the body-camera video "was in fact downloaded to [Capt. Carlson's] computer on February 19, 2020." (Dkt. No. 32-2, ¶ 8; Dkt. No. 32-3, ¶ 11.)

Capt. Carlson states that he "was completely unaware" that data stored on the H-drive "would be automatically overwritten and deleted by the network after 30 days." (Dkt. No. 32-1, ¶ 13.) There is, however, no factual support in this record for the contention that data saved on the H-drive was automatically overwritten and deleted by the network after thirty days. Rather, data saved on the H-drive was "backed up nightly in a rolling 30-day fashion . . . [so] all backup copies would be deleted and unrecoverable" after thirty days. (Dkt. No. 30-11, ¶ 6.) That is,

8

backups of the data saved on the H-drive, not the data itself, were automatically overwritten and deleted by the network after thirty days. (*Id.*) Capt. Carlson admits, however, that he "inadvertently[] never copied the video over to the Broome County Sheriff's Office K-drive, the main server." (Dkt. No. 32-1, ¶ 8.)

Lt. Harting's duties included "[p]eriodically, at least twice a year, . . . conduct[ing] a purge of all footage in Evidence.com." (Dkt. No. 32-2, ¶ 10.) "Law Enforcement personnel are required to add the appropriate retention categories and the Captain assigned to Corrections will remove any footage they require[;] [a]fter verification, all footage is removed," and Lt. Harting "set[s] all Corrections generated footage for deletion." (*Id.*) The body-camera video was deleted from the online storage system on July 15, 2020, (*id.* ¶ 12; Dkt. No. 32-2, ¶ 9; Dkt. No. 32-3, at 3), in accordance with Lt. Harting's assignment of a thirty-day "retention category." (Dkt. No. 32-2, ¶ 6.) The body-camera video was originally "uncategorized," meaning it would be retained indefinitely. (*Id.* ¶ 5.) When Lt. Harting added the thirty-day categorization to the body-camera video on July 8, 2020, thirty days had already elapsed, so the body-camera video was immediately deleted from Evidence.com. (*Id.* ¶ 6.)

Capt. Carlson did not know that the body-camera video was not on the H-drive after he had attempted to download it, and Capt. Carlson's personal computer was subsequently replaced "for purposes of upgrading equipment" in Capt. Carlson's office, though Capt. Carlson did not recall the date his computer was replaced. (Dkt. No. 32-1, ¶¶ 10, 13, 15). Lt. Harting and Capt. Carlson attempted to locate the body-camera video on Capt. Carlson's computer in August 2021, after the Broome County Attorney's Office requested it, (Dkt. No. 30-11, at 12), but the body-camera video could not be recovered from Capt. Carlson's computer; Capt. Carlson "continued to look for the video on his 'H drive' and external thumb drive/hard drive." (Dkt. No. 32-2, ¶ 9.)

When counsel for Defendants requested the body-camera video around August 2021, (Dkt. No. 30-11, at 12), Capt. Carlson became aware that the video could not be recovered. (Dkt. No. 32-1, ¶¶ 11–13.) Neither Defendant Broome County nor the Facility had a formal retention policy for body-camera video footage during the time period at issue. (Dkt. No. 30-12, at 2; Dkt. No. 32-2, ¶ 8.)

## III.   PLAINTIFF'S MOTION FOR SANCTIONS

In recognition of the fact that spoliation sanctions can impact a summary judgment analysis, *see Williams v. Lane*, No. 13-cv-965, 2016 WL 4275738, at *5, 2016 U.S. Dist. LEXIS 107939, at *15 (N.D.N.Y. Aug. 15, 2016) ("In borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001))), the Court turns first to Plaintiff's motion for sanctions.

### A.   Standard of Review

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). Historically, a party seeking sanctions based on the destruction of evidence was required to establish: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quoting *Byrnie*, 243 F.3d at 107–12). But in 2015, the Federal Rules of Civil Procedure were amended to address spoliation of electronically stored information ("ESI"). *See Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410,

425 (W.D.N.Y. 2017). Spoliation of ESI is now governed by Rule 37(e) of the Federal Rules of Civil Procedure and is subject to a slightly different analysis as compared to spoliation of tangible evidence. *See Matthews v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 17-cv-503, 2023 WL 2664418, at *12, 2023 U.S. Dist. LEXIS 52318, at *36 (N.D.N.Y. Mar. 28, 2023). Under Rule 37(e), where a court finds that "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court may, upon a finding of prejudice to a party, order measures no greater than necessary to cure the prejudice, or, only upon a finding of intent to deprive another party of the ESI, presume that the ESI was unfavorable to the spoliating party; instruct the jury that it may or must presume the ESI was unfavorable to the spoliating party; or dismiss the action or enter a default judgment.

"Aside from modifying the state of mind required of a spoliator, the 2015 amendments to Rule 37(e) did not significantly alter the elements required at common law for sanctions to issue." *Ungar v. City of N.Y.*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018), *aff'd*, No. 21-1384, 2022 WL 10219749, 2022 U.S. App. LEXIS 28812 (2d Cir. Oct. 18, 2022) (summary order). The party requesting spoliation sanctions "must still establish that the evidence 'should have been preserved in the anticipation or conduct of litigation,' i.e., that the spoliator had a duty to preserve the evidence, and that the evidence was 'lost because a party failed to take reasonable steps to preserve it,' i.e., that such a duty was breached." *Stanbro v. Westchester Cnty. Health Care Corp.*, No. 19-cv-10857, 2021 WL 3863396, at *5, 2021 U.S. Dist. LEXIS 163849, at *14 (S.D.N.Y. Aug. 27, 2021) (quoting Fed. R. Civ. P. 37(e)). "Furthermore, the movant must be prejudiced by the absence of the spoliated evidence to be entitled to sanctions under Rule

37(e)(1) . . . ." *Id.*, 2021 WL 3863396, at *5, 2021 U.S. Dist. LEXIS 163849, at *15 (citing *Ungar*, 329 F.R.D. at 13).[5]

While in general "[t]he party seeking sanctions bears the burden of establishing all elements of a claim for spoliation of evidence," *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008), Rule 37(e) "does not place a burden of proving or disproving prejudice on one party or the other . . . [but rather] leaves judges with discretion to determine how best to assess prejudice in particular cases," *Ungar*, 329 F.R.D. at 16 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Upon a finding of prejudice, a court "is tasked with determining the 'least harsh sanction that can provide an adequate remedy.'" *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 175 (S.D.N.Y. 2022) (quoting *Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014)).

B.    **Discussion**

Plaintiff moves for sanctions for Defendants' spoliation of relevant ESI, namely the body-camera video from the body camera worn by Defendant Weir during the SERT shakedown of Plaintiff's housing unit on February 10, 2020. (Dkt. No. 30-13, at 3.) Specifically, Plaintiff seeks sanctions in the form of an adverse inference instruction, preclusion of evidence related to the spoliated body-camera video, and costs and fees associated with the motion for sanctions. (*Id.* at 3, 18.) Defendants argue that sanctions are not warranted because (1) Defendants were not under a duty to preserve when the body-camera video was destroyed; (2) the body-camera video was not destroyed with the requisite state of mind; and (3) Plaintiff cannot demonstrate that the

---

[5] Sanctions under Rule 37(e)(2), however, do not require the court to find prejudice to the party deprived of the information "because the finding of intent required by [Rule 37(e)(2)] can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

body-camera video would have corroborated his claims. (Dkt. No. 32-4, at 5–10.) In their supplemental letter-brief, Defendants also argue that (1) Defendants took reasonable steps to preserve the body-camera video; (2) Plaintiff was not prejudiced by the loss of the body-camera video; and (3) Defendants did not act with the intent to deprive Plaintiff of the body-camera video. (Dkt. No. 40, at 2–6.)

As an initial matter, neither party originally premised its argument fully on the Rule 37(e) standard, which is applicable to spoliation of ESI and which, as discussed above, differs from the common-law standard applicable to tangible evidence. While Plaintiff refers to the common-law spoliation standard, he also cites Rule 37(e) and correctly notes that Rule 37(e) requires proof of intent to deprive in order to justify imposition of an adverse inference instruction. (Dkt. No. 30-13, at 13; Dkt. No. 34, at 5.) Defendants, meanwhile, did not cite Rule 37(e) at all in their opposition to Plaintiff's motion and relied entirely on the common-law standard. However, at the Court's direction, (Dkt. No. 39), Defendants submitted a supplemental letter-brief in which they agree that the body-camera video constitutes ESI but argue that sanctions under Rule 37(e) should not be imposed. (Dkt. No. 40.)

The Court agrees with the parties that the body-camera video, which was stored and viewed electronically, (Dkt. No. 32-1, ¶¶ 3, 7–8; Dkt. No. 32-2, ¶¶ 4–5, 8; Dkt. No. 32-3; Dkt. No. 31-11, at 23), constitutes ESI. *See Stanbro*, 2021 WL 3863396, at *9–10, 2021 U.S. Dist. LEXIS 163849, at *26–27 (holding that digital footage from a handheld video camera, even when stored on a DVD, constitutes ESI); *see also Ungar*, 329 F.R.D. at 14 (applying the Rule 37(e) standard to destruction of surveillance video footage); *Thomas v. Butkiewicus*, No. 13-cv-747, 2016 WL 1718368, at *7 n.11, 2016 U.S. Dist. LEXIS 57163, at *25 n.11 (D. Conn. Apr. 29, 2016) ("There does not appear to be a question that the surveillance video footage at issue

. . . falls within the definition of 'electronically stored information' under Rule 37(e).").
Accordingly, the Court will analyze Plaintiff's motion under the standard imposed by Rule 37(e).

### 1.  Duty to Preserve ESI

Plaintiff argues that Defendants had a duty to preserve the body-camera video beginning on February 12, 2020, the day Plaintiff filed a grievance about the February 10, 2020, incident. (Dkt. No. 30-13, at 6–7.) Defendants argue that they were not on notice to preserve the body-camera video because Plaintiff's grievance did not request the preservation of any video evidence and the body-camera video was destroyed before Defendants received a notice of claim. (Dkt. No. 32-4, at 5–6.) Defendants also argue that because the underlying incident "was nothing of note" and "in the absence of physical injury" to Plaintiff, Defendants had no duty to preserve the body-camera video. (Dkt. No. 40, at 2–3.)

"Identifying the boundaries of the duty to preserve [ESI] involves two related inquiries: when does the duty to preserve attach, and what evidence must be preserved?" *Europe*, 592 F. Supp. 3d at 176 (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). The duty to preserve attaches "when [a] party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *See id.* (quoting *Fujitsu Ltd. v. Fed Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). For the purposes of the duty to preserve, "'relevance' means relevance for purposes of discovery, which is 'an extremely broad concept.'" *Orbit One Commc'ns v. Numerex Corp.*, 271 F.R.D. 429, 436–37 (S.D.N.Y. 2010). "[A] litigant has the duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Europe*, 592 F. Supp. 3d at 176 (alteration in original) (quoting *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 407 (S.D.N.Y. 2015)).

Here, Plaintiff filed a grievance on February 12, 2020, which provided his version of the relevant events of February 10, 2020. (Dkt. No. 30-13, at 4–5.) In his grievance, Plaintiff said, "I got a lawyer to file a lawsuit." (Dkt. No. 31-15, at 1.) There is no dispute that the deleted body-camera video constituted evidence relevant to Plaintiff's potential lawsuit. Defendant Weir uploaded the body-camera video to the online storage system, and the body-camera video was one of the items that Facility personnel relied on to respond to Plaintiff's grievance. (Dkt. No. 32-1, ¶ 9; Dkt. No. 31-5, ¶ 3; Dkt. No. 31-15, at 5, 9.) At that point, the Facility "should have known" that the body camera video "may be relevant to future litigation," and the Facility had an obligation to preserve it. *See Castro v. Smith*, No. 16-cv-8147, 2023 WL 5371311, at *8, 2023 U.S. Dist. LEXIS 149515, at *23–24 (S.D.N.Y. Aug. 22, 2023) (quoting *Zubulake*, 220 F.R.D. at 216).

Defendants rely *Williams v. Lane* in arguing that they were not put on notice to preserve evidence relevant to future litigation when Plaintiff filed his grievance. (Dkt. No. 32-4, at 5–6.) But *Williams* is plainly distinguishable. *Williams* involved a claim of interference with non-legal mail in violation of the First Amendment. *See* 2016 WL 4275738, at *2, 2016 U.S. Dist. LEXIS 107939, at *4. Establishing a claim for mail interference with non-legal mail requires a showing of "a pattern and practice of interference that is not justified by a legitimate penological concern," *Id.* (citation omitted). Thus, in attempt to establish such a pattern or practice, the plaintiff had filed a grievance alleging that malfeasance had been occurring "for months." *Id.* The plaintiff argued that a video recording that had been destroyed would have captured a defendant's alleged verbal admission that he had been interfering with the plaintiff's mail; in rejecting the spoilation claim the Court first noted that any such videotaped admission would not have raised a material issue of fact. *See id.*, 2016 WL 4275738, at *6, 2016 U.S. Dist. LEXIS

107939, at *18. While the court then proceeded to discuss and reject the spoilation argument, there is no indication that the grievance in *Williams* provided the defendants in that action with notice that the video recording in question "may be relevant to future litigation" or that the defendants in *Williams* were aware of a need to preserve any specific video footage. *See id.*, 2016 WL 4275738, at *2, *6, 2016 U.S. Dist. LEXIS 107939, at *4, *18.

Accordingly, the Court concludes that the Facility was under a duty to preserve relevant evidence at the time the body-camera video was deleted.[6]

### a.   Defendants' Control Over the Body-Camera Video

Defendants briefly argue that Defendants Hrebin, Fowler, and Weir cannot have culpability attributed to them because they did not have control of the body-camera video. (Dkt. No. 32-4, at 8–9.) The Court has found that the Facility was under a duty to preserve relevant evidence at the time the body-camera video was deleted, but the Court will next examine whether it is appropriate the impute that duty to Defendants Hrebin, Fowler, and Weir.

"Implicit in a party's duty to preserve evidence is the assumption that the party against whom sanctions are sought had 'control' over the missing evidence." *Stanbro*, 2021 WL 3863396, at *11, 2021 U.S. Dist. LEXIS 163849, at *30 (citations omitted). "[E]ven where a party . . . lacks actual physical possession or custody of requested documents . . . such party may nevertheless be found to have control of the documents . . . if the party is legally entitled to the documents or has the practical ability to acquire the documents from a third-party . . . ." *Richard*

---

[6] Even if Plaintiff's grievance did not put the Facility on notice to preserve relevant evidence, Defendants' argument that the video was destroyed before they received a notice of claim is entirely unavailing because Defendants concede that the Broome County Attorney's Office received a notice of claim on April 27, 2020, (Dkt. No. 31-8; Dkt. No. 32-4, at 3, 5), and the video was not destroyed until July 15, 2020, (Dkt. No. 32-3, at 3). Thus, Facility personnel were unquestionably under a duty to preserve the video from April 27, 2020, onward. *See Hughes v. City of N.Y.*, No. 18-cv-9380, 2021 WL 4295209, at *11, 2021 U.S. Dist. LEXIS 180064, at *26 (S.D.N.Y. Sept. 21, 2021) ("Upon receipt of the Notice of Claim, Defendants should have known that [evidence related to the underlying incident] may be relevant to anticipated litigation.").

*v. Dignean*, No. 11-cv-6013, 2021 WL 5782106, at *3, 2021 U.S. Dist. LEXIS 234419, at *8

(W.D.N.Y. Dec. 7, 2021) (alterations in original) (quoting *Gross v. Lunduski*, 304 F.R.D. 136,

142 (W.D.N.Y. 2014)). In assessing whether a party had the practical ability to acquire evidence

from a third party, "courts look at the interrelatedness of the relationship between the party

against whom sanctions are sought and the entity with custody of the evidence." *See Stanbro*,

2021 WL 3863396, at *12, 2021 U.S. Dist. LEXIS 163849, at *31 (citing *Guillory v. Skelly*, No.

12-cv-847, 2014 WL 4542468, at *8, 2014 U.S. Dist. LEXIS 128178, at *20–21 (W.D.N.Y.

Sept. 11, 2014)). Of note, "[c]ourts in this circuit addressing the issue [of control of evidence]

have routinely found that 'in suits against individual corrections officers employed by [New

York State Department of Corrections and Community Supervision ("DOCCS")] . . . , a

sufficiently close relationship . . . exists to impute DOCCS's control over evidence to the

individual officers.'" *Id.*, 2021 WL 3863396, at *12, 2021 U.S. Dist. LEXIS 163849, at *31

(collecting cases); *see also Castro*, 2023 WL 5371311, at *6, 2023 U.S. Dist. LEXIS 149515, at

*17 ("[C]ourts in myriad circuits have found there to be a 'special relationship' between

correctional departments and individual officers, holding that the departments 'ultimately bear

responsibility for preserving evidence and litigating cases filed by prisoners, and so their failure

to preserve evidence may be imputed to individual officer defendants in order to avoid unfair

prejudice' to litigants who are or were incarcerated." (quoting *Johns v. Gwinn*, 503 F. Supp. 3d

452, 463 (W.D. Va. 2020))).

   The Court sees no reason for this principle to differ when applied instead to a county-

level correctional facility.[7] It is not disputed that Defendant Broome County had possession of

---

[7] The Court notes that several courts have also "denied requests for sanctions against defendant corrections officers who "had no control over the recordings, had no duty to maintain them, and were not in any way involved in the failure to preserve the evidence." *See Barnes v. Harling*, 368 F. Supp. 3d 573, 609 (W.D.N.Y. 2019) (quoting *Thousand v. Corrigan*, No. 15-cv-1025, 2017 WL 4480185, at *3, 2017 U.S. Dist. LEXIS 166198, at *7 (N.D.N.Y.

the body-camera video. Furthermore, the relationship between, on the one hand, Defendants

Hrebin, Fowler, and Weir and, on the other, Defendant Broome County is sufficiently

interrelated such that Defendants Hrebin, Fowler, and Weir "had the practical ability to obtain"

the body-camera video from Defendant Broome County. *See Stanbro*, 2021 WL 3863396, at

*12, 2021 U.S. Dist. LEXIS 163849, at *32. Indeed, the Broome County Attorney's Office

represents—and attempted to obtain the body-camera video from various sources on behalf of—

all Defendants. (Dkt. No. 30-11, at 12; Dkt. No. 32, ¶¶ 8–9; *see Stanbro*, 2021 WL 3863396, at

*12, 2021 U.S. Dist. LEXIS 163849, at *32–33 (citing *In re NTL, Inc. Sec. Litig.*, 244 F.R.D.

179, 195 (S.D.N.Y. 2007)).[8] Counsel for Defendants also produced other evidence that was in

Defendant Broome County's possession, including the surveillance footage and the handheld

SERT video. (Dkt. No. 32, ¶ 3.) This relationship gave Defendants Hrebin, Fowler, and Weir the

practical ability to acquire the body-camera video and, therefore, control of the body-camera

video. *See id.*; *see also Castro*, 2023 WL 5371311, at *6–7, 2023 U.S. Dist. LEXIS 149515, at

---

Oct. 6, 2017)). In such cases, unlike the instant case, the party with control of the evidence at issue is generally not a party to the action. *See Barnes*, 368 F. Supp. 3d at 609; *Thousand*, 2017 WL 4480185, at *3, 2017 U.S. Dist. LEXIS 166198, at *7; *Braham v. Lantz*, No. 08-cv-1564, 2014 WL 1270096, at *7, 2014 U.S. Dist. LEXIS 40572, at *19 (D. Conn. Mar. 27, 2014); *Grant v. Salius*, No. 09-cv-21, 2011 WL 5826041, at *3, 2011 U.S. Dist. LEXIS 133248, at *8–9 (D. Conn. Nov. 18, 2011). And in any case, in determining that Defendants Hrebin, Fowler, and Weir had control over the body-camera video, the Court does not endorse a bright-line rule that a county's spoliation of evidence should be imputed to its corrections officers. *See Stanbro*, 2021 WL 3863396, at *7, 2021 U.S. Dist. LEXIS 163849, at *19. Rather, the Court considers "the purposes of a spoliation sanction" and the case-specific "factors for determining whether one should be imposed here." *See id.*, 2021 WL 3863396, at *7, 2021 U.S. Dist. LEXIS 163849, at *19–20 (quoting *Adkins v. Wolever*, 692 F.3d 499, 506 (6th Cir. 2012)).

[8] Defendants' arguments based on *Stanbro* are misplaced. (Dkt. No. 40, at 3.) In *Stanbro*, the court refused to levy sanctions against defendants who did not have direct control of video evidence that was ultimately destroyed. *See Stanbro*, 2021 WL 3863396, at *7, 2021 U.S. Dist. LEXIS 163849, at *20. Crucial to that conclusion, however, was the court's determination that the absence of the spoliated video did not prejudice the plaintiff's claims against those defendants because the spoliated video, which was taken hours after the incident at issue, was not "at the heart" of the plaintiff's claims against those defendants. *See id.* Here, however, the body-camera video would have been at the heart of Plaintiff's claims, as it was contemporaneous evidence demonstrating what happened in Plaintiff's cell for a portion of the relevant time. Furthermore, the court in *Stanbro* undertook a case-specific inquiry that did not rely on finding that the defendants lacked control. *See id.* Thus, the particular conclusion in *Stanbro* to which Defendants point is inapposite and does not support the conclusion that Defendants Hrebin, Fowler, and Weir lacked control of the body-camera video.

*18–19 (imputing the New York City Department of Corrections' spoliation of video evidence to individual defendant corrections officers where the Department and officers were represented by the same counsel; their counsel had produced evidence in the litigation; counsel produced a declaration attempting to explain the spoliation; and the individuals were likely entitled to indemnification).

### 2.    Reasonable Steps to Preserve ESI

The parties dispute whether reasonable steps were taken to preserve the body-camera video. (Dkt. No. 30-13, at 14; Dkt. No. 34, at 5–6; Dkt. No. 40, at 4.) Specifically, Defendants point to Defendant Weir successfully docking his body camera, which then uploaded the body-camera video to Evidence.com, and Capt. Carlson manually downloading the video to his H-drive and "believ[ing] the video would be protected" there as the reasonable steps taken. (*Id.*)

"Once the obligation to preserve relevant ESI attaches, the party in possession of that ESI must take 'reasonable steps' to preserve it." *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 61 (S.D.N.Y. 2020) (quoting Fed. R. Civ. P. 37(e)). This obligation "requires a litigant to do more than refrain from intentionally destroying relevant evidence; the litigant must also 'take affirmative steps to prevent inadvertent spoliation.'" *Europe*, 592 F. Supp. 3d at 177 (quoting *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015)). In general, a party must "identify[] all sources of potentially relevant evidence and implement[] a 'litigation hold' suspending any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence." *Europe*, 592 F. Supp. 3d at 177 (quoting *Skyline Steel*, 101 F. Supp. 3d at 40). "Counsel is 'obligated to "oversee compliance with [a] litigation hold, monitoring the party's efforts to retain and produce the relevant documents," and to "become fully familiar with [their] client's document retention policies, as well as the client's data

retention architecture.'"" *Hughes*, 2021 WL 4295209, at *11, 2021 U.S. Dist. LEXIS 180064, at

*31 (quoting *Lokai Holdings, LLC v. Twin Tiger USA LLC*, No. 15-cv-9363, 2018 WL 1512055,

at *8, 2018 U.S. Dist. LEXIS 46578, at *37 (S.D.N.Y. Mar. 12, 2018)). "Where a party fails to

timely institute 'a formal litigation hold and . . . otherwise informally preserve ESI,' [a] [c]ourt

can conclude that it did not undertake reasonable steps to preserve ESI." *Charlestown Cap.*

*Advisors*, 337 F.R.D. at 61 (quoting *Capricorn Mgmt. Sys., Inc. v. Gov't. Employees Ins. Co.*,

No. 15-cv-2926, 2019 WL 5694256, at *10, 2019 U.S. Dist. LEXIS 123723, at *36 (E.D.N.Y.

July 22, 2019), *report and recommendation adopted*, 2020 WL 1242616, 2020 U.S. Dist. LEXIS

45301 (E.D.N.Y. Mar. 16, 2020)). "The 'reasonable steps' inquiry has been equated to 'roughly

a negligence standard.'" *id.* (quoting *Leidig v. Buzzfeed, Inc.*, No. 16-cv-542, 2017 WL 6512353,

at *10, 2017 U.S. Dist. LEXIS 208756, at *32 (S.D.N.Y. Dec. 19, 2017)); *see also Stanbro*, 2021

WL 3863396, at *13, 2021 U.S. Dist. LEXIS 163849, at *36 ("In the discovery context,

negligence is a failure to conform to the standard of what a party must do to meet its obligation

to participate meaningfully and fairly in the discovery phase of a judicial proceeding." (quoting

*Harkabi v. SanDisk Corp.*, 275 F.R.D. 414, 418–19 (S.D.N.Y. 2010)).

Here, Defendant Weir fulfilled his obligation to properly submit the body-camera video

to the online storage system by docking his body camera. (Dkt. No. 32-4, at 9; Dkt. No. 31-11, at

23.) And the body-camera video was, in fact, uploaded to that storage system. (Dkt. No. 32-3, at

1.) However, at the relevant time, Defendants did not have a formal retention policy for body-

camera video. (Dkt. No. 30-12, at 2; Dkt. No. 32-2, ¶ 8.) Furthermore, although the Broome

County Attorney's Office received notice of the Plaintiff's claim on April 27, 2020, there is no

evidence before the Court that the Broome County Attorney's Office took steps to preserve the

body-camera video until August 2021. (Dkt. No. 30-11, at 12); *see Hughes*, 2021 WL 4295209,

at *10, 2021 U.S. Dist. LEXIS 180064, at *28–29 ("[T]he preservation obligation runs first to counsel, who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction." (quoting *Herman v. City of N.Y.*, 334 F.R.D. 377, 385 (E.D.N.Y. 2020)). Nor is there evidence before the Court that the Broome County Attorney's Office instituted any sort of formal litigation hold related to the incident at issue. Though Capt. Carlson attempted unsuccessfully to informally preserve the body-camera video by downloading it, (Dkt. No. 32-1, ¶ 7–8; Dkt. No. 32-3, at 2–3), it was nevertheless lost—either because Capt. Carlson never successfully downloaded it to his H-drive or because he failed to transfer it to the Broome County Sheriff's Office K-drive—and it was deleted from the online storage system on July 15, 2020, (Dkt. No. 32-1, ¶ 12; Dkt. No. 32-2, ¶ 9; Dkt. No. 32-3, at 3).[9] Thus, Defendants and their counsel failed to take reasonable steps to preserve the video. *See Sosa v. Carnival Corp.*, No. 18-cv-20957, 2018 WL 6335178, at *19, 2018 U.S. Dist. LEXIS 204933, at *53–54 (S.D. Fla. Dec. 4, 2018) (finding that attempting but failing to successfully download a video to a computer drive amounts to failing to "act 'reasonably' to preserve" it). There is no dispute that the body-camera video cannot be replaced. Accordingly, the Court concludes that Defendants and their counsel failed to take reasonable steps to preserve the body-camera video and thereby breached their duty to preserve.

### 3.   Prejudice

Plaintiff argues that destruction of the body-camera video was highly prejudicial to his case because "the footage was the only objective direct evidence to support his claim," and

---

[9] Defendants argue that Capt. Carlson did download the body-camera video to his H-drive but that it was "automatically overwritten and destroyed." (Dkt. No. 32-4, at 5–6.) As the Court previously noted, there is no support in the record for the contention that data on the H-drive is ever "automatically overwritten." Rather, data saved on the H-drive is "backed up nightly in a rolling 30-day fashion," and "all backup copies would be deleted and unrecoverable" after thirty days. (Dkt. No. 30-11, ¶ 6.) That is, backups of the data saved on the H-drive, not the data itself, are automatically overwritten and deleted by the network after thirty days. (*Id.*)

Plaintiff further argues that evidence that Plaintiff lacked observable injuries before entering his cell and had observable injuries upon leaving his cell supports his position. (Dkt. No. 30-13, at 7–9.) Plaintiff also submitted, in connection with his opposition to Defendants' motion for summary judgment, two statements from inmates who were present in Plaintiff's housing unit during the incident, both of whom stated they heard sounds of an assault occurring. (Dkt. No. 33-3, at 2–4.) Defendants argue that Plaintiff has failed to corroborate his claims with other evidence. (Dkt. No. 32-4, at 9–10.) Specifically, Defendants argue that other video evidence does not show that any assault occurred, (*id.* at 10), and submit an affidavit from Capt. Carlson, who viewed the body-camera video, (Dkt. No. 32-1, ¶ 3; Dkt. No. 32-3, at 1–2), and stated that the body-camera video "showed Defendants Hrebin and Fowler searching the Plaintiff's cell on through the window of the closed door to Plaintiff's cell . . . without incident" before "divert[ing] away from the door as Defendants Hrebin and Fowler begin strip searching Plaintiff which prompted Defendant Weir to turn away from the door for privacy reasons and then proceed down the stairs," (Dkt. No. 32-1, ¶¶ 4–6). Capt. Carlson further stated that the body-camera video "clearly showed our officers did not assault Mr. Vega"; that "no sounds can be heard" from Plaintiff; and that he "believe[s] the body camera video would have been entirely favorable to the defense of this action." (*Id.* ¶¶ 6, 9, 16.) Additionally, Capt. Stanton, who was also present during the SERT shakedown, "did not witness any assault of the Plaintiff . . . and did not hear any calls of distress or yelling from Plaintiff's cell." (Dkt. No. 31-4, ¶ 4.)

Rule 37(e) permits a court to impose sanctions under subdivision (e)(1) "upon finding prejudice to another party from the loss of the information." But the "precise definition of prejudice for the purposes of Rule 37(e) is not clear." *Stanbro*, 2021 WL 3863396, at *14, 2021 U.S. Dist. LEXIS 163849, at *38. "The Advisory Committee Note to the 2015 Amendment

merely provides that '[a]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation.'" *Id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Thus, "[t]wo different views of 'prejudice' may be hypothesized": (1) "'prejudice' may be taken to mean merely that the evidence is probative, similar to the concept of relevance under Fed. R. Evid. 401"; or (2) "prejudice may require proof that the evidence was not only probative, but that it would affirmatively support the movant's claim." *Ungar*, 329 F.R.D. at 15. However, "[c]ourts in this Circuit generally require some proof of prejudice in the latter sense before sanctions will issue." *Id.*

But Rule 37(e) "does not place a burden of proving or disproving prejudice on one party or the other." *Ungar*, 329 F.R.D. at 16 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Rather, Rule 37(e) "leaves judges with discretion to determine how best to assess prejudice in particular cases," *id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment), though "the Second Circuit has cautioned district courts against 'holding the prejudiced party to too strict a standard of proof regarding the likely contents of . . . destroyed evidence,'" *Moody*, 271 F. Supp. 3d at 430 (quoting *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998)); *see also Taylor v. City of N.Y.*, 293 F.R.D. 601, 614 (S.D.N.Y. 2013) (citing *Residential Funding Corp.*, 306 F.3d at 109; *Kronisch*, 150 F.3d at 130). Courts have noted that proof that destroyed ESI "would affirmatively support the movant's claim" may not be "categorically necessary in all instances" for spoliation sanctions to be warranted. *See Ungar*, 329 F.R.D. at 15.

Here, given the broad discretion provided by Rule 37(e), *see Ungar*, 329 F.R.D. at 16, the importance of the body-camera video to the litigation, *see Stanbro*, 2021 WL 3863396, at *14,

2021 U.S. Dist. LEXIS 163849, at *38, and Defendants' negligent destruction of the body-camera video, the Court finds that Plaintiff must establish that "existing evidence plausibly 'suggests' that the spoliated ESI could support" his case. *See Karsch v. Blink Health Ltd.*, No. 17-cv-3880, 2019 WL 2708125, at *21, 2019 U.S. Dist. LEXIS 106971, at *57 (S.D.N.Y. June 20, 2019) (collecting cases). This burden is appropriate given the Court's "recogni[tion] that [a] negligent party has no right to benefit from its negligence." *See Europe*, 592 F. Supp. 3d at 178 (citing *Ungar*, 329 F.R.D. at 16).

The Court finds that, for the purposes of Rule 37(e), Plaintiff has demonstrated that existing evidence plausibly suggests that the body-camera video could have supported his claims. Plaintiff testified that he sustained injuries as a result of the incident. (Dkt. No. 31-9, at 52–54; Dkt. No. 31-10, at 79–80.) Defendant Hrebin testified that he did not recall any bruises or scratches on Plaintiff before the incident. (Dkt. No. 31-12, at 33.) Defendant Fowler testified the same. (Dkt. No. 31-13, at 26–27.) But the Facility's medical records objectively demonstrate that Plaintiff had injuries after the incident, (Dkt. No. 31-15, at 7–8), and there is video evidence demonstrating bruises and scratches on Plaintiff after the incident, (Dkt. No. 35, ex. C). Furthermore, Plaintiff has submitted statements from inmates who were present in Plaintiff's housing unit during the incident, both of whom stated they heard sounds of an assault occurring. (Dkt. No. 33-3, at 2–4.)[10] The body-camera video was therefore very important to Plaintiff's

---

[10] Defendants make the cursory observation that these statements are hearsay. (Dkt. No. 32-4, at 10.) But "[h]earsay evidence is admissible at the summary judgment stage if the contents would otherwise be admissible at trial." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 215 (S.D.N.Y. 2007) (citing *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam)), *aff'd*, 354 F. App'x 496 (2d Cir. 2009) (summary order); *see also Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) (summary order) ("[M]aterial relied on at summary judgment need not be admissible in the form presented to the district court. Rather, so long as the evidence in question 'will be presented in admissible form at trial,' it may be considered on summary judgment." (quoting *Santos*, 243 F.3d at 683)). Here, it is possible the other inmates will testify at trial, *see Auz v. Century Carpet, Inc.*, No. 12-cv-417, 2014 WL 199511, at *1 n.1, 2014 U.S. Dist. LEXIS 6751, at *2 n.1 (S.D.N.Y. Jan. 17, 2014). Thus, the Court finds no basis to disregard the inmates' statements in consideration of Plaintiff's motion for sanctions or Defendants' motion for summary judgment.

case: it was the only objective evidence of what occurred in Plaintiff's cell, and, in light of the existing evidence to which Plaintiff points, it is plausible that it could have supported Plaintiff's claims. Thus, the destruction of the body-camera video "deprived [P]laintiff of relevant, non-cumulative, and potentially powerful evidence," *see Ransom v. Andrews*, No. 21-cv-6343, 2022 WL 16555362, at *5, 2022 U.S. Dist. LEXIS 197852, at *14 (S.D.N.Y. Oct. 31, 2022), and Plaintiff has "plausibly 'suggest[ed]'" that the body-camera video "could [have] support[ed] [his] case," *see Karsch*, 2019 WL 2708125, at *21, 2019 U.S. Dist. LEXIS 106971, at *57.

This conclusion is supported by the characterization that Facility personnel seek to make regarding the body-camera video and other video evidence. Capt. Carlson states that the body-camera video "clearly showed our officers did not assault" Plaintiff. (Dkt. No. 32-1, ¶ 9.) Capt. Stanton similarly states that the body-camera video, the handheld SERT video, and the surveillance footage "show[] Plaintiff being noncompliant with officers during the SERT shakedown . . . [and] subsequently show[] Plaintiff being escorted into his cell by Defendants Hrebin and Fowler where Defendants Hrebin and Fowler conducted a search of Plaintiff's cell and of Plaintiff's person without incident." (Dkt. No. 31-4, ¶ 5.) Grievance Officer Valls almost identically states that the body-camera video "shows Plaintiff being noncompliant with officers during the SERT shakedown . . . [and] subsequently shows Plaintiff being escorted into his cell by Defendants Hrebin and Fowler where Defendants Hrebin and Fowler conducted a search of Plaintiff's cell and of Plaintiff's person without incident." (Dkt. No. 31-5, ¶ 3.) The Court's review of existing video evidence, however, demonstrates that neither the handheld SERT video nor the surveillance footage shows the interaction between Plaintiff and Defendants Hrebin and Fowler in Plaintiff's cell. (Dkt. No. 37, exs. A, B.) And the body-camera video would have shown eight seconds of the five- to six-minute interaction. (*Id.* ex. A at 17:23:20–17:23:28.)

Thus, even if the body-camera video did not show any use of force, it would not "clearly" support the conclusion that Defendants Hrebin and Fowler "did not assault" Plaintiff, (Dkt. No. 32-1, ¶ 9), or that the interaction between Defendants Hrebin and Fowler and Plaintiff proceeded "without incident," (Dkt. No. 31-4, ¶ 5; Dkt. No. 31-5, ¶ 3). Allowing such testimony in the absence of the body-camera itself would allow "the negligent party . . . to benefit from its negligence," *see Europe*, 592 F. Supp. 3d at 178, and would further prejudice Plaintiff where Plaintiff has produced some evidence supporting his allegations..

Defendants argue that the other video footage, which the Court previously discussed, demonstrates that the body-camera video would not have supported Plaintiff's claims, (Dkt. No. 32-4, at 10), but the Court is unpersuaded. Surveillance footage, which Defendants imply shows no inmates looking toward Plaintiff's cell, shows inmates looking around in all directions, (Dkt. No. 37, ex. A), including at Plaintiff's cell during the relevant time, (*id.* at 17:22:40–43, 17:23:07–17, 17:24:42–47). The handheld camera footage, which Defendants claim includes no sounds of yelling or slapping, does not include clear enough audio for the Court to reach the same conclusion. (*Id.* ex. B.)

Defendants also argue that the lapse in time between the incident in Plaintiff's cell and the video call between Plaintiff and his mother gave Plaintiff time to "inflict those injuries upon himself," (Dkt. No. 32-4, at 10), and the Facility's medical records do reflect that scratches on Plaintiff were "in a very odd pattern" and were "questionable [as if] self inflicted," (Dkt. No. 31-15, at 8). But requiring Plaintiff to provide more evidence of what happened between the incident in his cell and the video call with his mother than he has already provided would be holding Plaintiff to too strict a standard of proof in light of the fact that Plaintiff has already plausibly suggested that the body-camera video could have supported his claims and that

Defendants failed to take reasonable steps to preserve the apparently sole piece of evidence that would have objectively shown, at least in part, what occurred during that period. *See Moody*, 271 F. Supp. 3d at 430; *Taylor*, 293 F.R.D. at 614. Thus, Defendants' argument is unpersuasive.

The Court therefore concludes that Plaintiff has demonstrated that existing evidence plausibly suggests the body-camera video could have supported Plaintiff's case. *See Karsch*, 2019 WL 2708125, at *21, 2019 U.S. Dist. LEXIS 106971, at *57. This is especially true given that the Court will not "hold[] [Plaintiff] to too strict a standard of proof regarding the likely contents of" the body-camera video. *See Moody*, 271 F. Supp. 3d at 430 (quoting *Kronisch*, 150 F.3d at 128). Accordingly, the Court finds, to the extent necessary for the purposes of Rule 37(e), that Plaintiff has established prejudice from the destruction of the body-camera video.

### 4.    Intent to Deprive

Plaintiff seeks an adverse inference instruction and argues that Defendants exhibited the requisite intent to deprive Plaintiff of use of the body-camera video because the body-camera video was crucial to, if not dispositive of, Plaintiff's case, and Defendants "intentionally did not take reasonable steps to preserve" the body-camera video. (Dkt. No. 30-13, at 13–14.) Defendants argue that "the record is devoid of bad faith or a showing that a conscious effort was made to suppress the same as evidence in this matter" and that "nothing from the record suggests that the video was deliberately destroyed with the intention to deprive the Plaintiff." (Dkt. No. 32-4, at 7, 9; *see also* Dkt. No. 40, at 5–6)

An adverse inference instruction is a sanction available only under Rule 37(e)(2) when ESI is at issue. The sanctions available under Rule 37(e)(2) require a finding that the spoliating party "acted with the intent to deprive another party of the information's use in the litigation." "[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *Stanbro*, 2021 WL

3863396, at *15, 2021 U.S. Dist. LEXIS 163849, at *43 (quoting *Charlestown Cap. Advisors*, 337 F.R.D. at 66). "This intent standard is 'stringent' and 'does not parallel other discovery standards.'" *Moody*, 271 F. Supp. 3d at 431 (quoting *Jenkins v. Woody*, No. 15-cv-355, 2017 WL 362475, at *17, 2017 U.S. Dist. LEXIS 9581, at *43 (E.D. Va. Jan. 21, 2017)). "Courts are 'divided with respect to the appropriate standard of proof to apply to a claim of spoliation;' some courts require a showing of intent to deprive by a preponderance of the evidence, while others require clear and convincing evidence." *Id.* (quoting *Resnik v. Coulson*, 17-cv-676, 2019 WL 2256762, at *6, 2019 U.S. Dist. LEXIS 92159, at *16–17 (E.D.N.Y. Jan. 4, 2019)). The Court need not resolve this issue, however, because even under the less onerous preponderance of the evidence standard, Plaintiff has not demonstrated that Defendants acted with the intent to deprive him of use of the body-camera video in this action.

Plaintiff premises his first argument—that where destroyed evidence was crucial to a party's case, courts have found intent has been shown—on *Moody v. CSX Transportation*. (Dkt. No. 30-13, at 14.) But in that case, "the affirmative act causing the loss [of ESI] [could not] be credibly explained as not involving bad faith by the reason proffered by the spoliator." *See Moody*, 271 F. Supp. 3d at 431 (quoting *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017)). Here, however, Defendants' proffered reason for the destruction of the body-camera video can be credibly explained as not involving bad faith. The record indicates that Capt. Carlson tried to download the body-camera video to preserve it. (Dkt. No. 32-1, ¶¶ 7– 8; Dkt. No. 32-3, at 2–3.) Capt. Carlson states that he did not know that the body-camera video was not on his computer after he attempted to download it. (Dkt. No. 32-1, ¶¶ 13, 15.) Upon realizing that the body-camera video was not on his computer, Capt. Carlson contacted the Broome County IT Department, on August 25, 2021, to attempt to recover it. (Dkt. No. 30-11, at

12.) Either Capt. Carlson's unawareness as to how to download data from Evidence.com or his inadvertent failure to copy the body-camera video to the necessary shared computer drive after downloading it is the reason for the loss of the body-camera video, and Capt. Carlson's statements to IT personnel demonstrate that he lacked the intent to deprive any party of the body-camera video. (Dkt. No. 30-11, at 5 ("There is no way I would have deleted [the body-camera video] as it protects my staff and contradicts the inmates claims."), 9 ("It is imperative that the [body-camera] video is recovered . . . ."), 12 ("I know I downloaded and saved [the body-camera video]."))) Plaintiff, for his part, has not put forth any support for the contention that Capt. Carlson's confusion or inadvertent oversight amounted to bad faith, let alone an intent to deprive Plaintiff of the body-camera video.

Plaintiff's second argument—that "[a] party's conscious dereliction of a known duty to preserve electronic data is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2),'" (Dkt. No. 30-13, at 13 (quoting *Ungar*, 329 F.R.D. at 13))—is similarly misplaced. This argument relies on the proposition that Plaintiff "intentionally did not take reasonable steps to preserve the" body-camera video. (Dkt. No. 30-13, at 14.) But only if Defendants "did not intentionally take *any* steps to preserve" the body-camera video would Plaintiff's argument hold water. *See Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 582 (S.D.N.Y. 2017) (emphasis added). Plaintiff ignores the fact that Capt. Carlson did, in fact, attempt to preserve the video by downloading it. Thus, while the Court has found that Defendants and their counsel failed to take reasonable steps to ensure that the body-camera video was preserved, Plaintiff has not demonstrated that Defendants acted with the intent to deprive him of use of the body-camera

video in this action. Accordingly, sanctions authorized by Rule 37(e)(2), which include an

adverse inference instruction, are unavailable.

### 5.    Appropriate Sanctions

Plaintiff argues that, aside from an adverse inference instruction, preclusion of any

evidence related to the body-camera video and attorney's fees associated with Plaintiff's motion

for sanctions are appropriate. (Dkt. No. 30-13, at 16–17.) Defendants do not specifically argue

that these sanctions are inappropriate.

Plaintiff has established that the body-camera video should have been preserved in the

anticipation of litigation; the body-camera video was lost because Defendants and their counsel

failed to take reasonable steps to preserve it; the body-camera video cannot be restored or

replaced through additional discovery; and Plaintiff was prejudiced as a result of the destruction

of the body-camera video. Thus, under Rule 37(e)(1), the Court may order measures no greater

than necessary to cure the prejudice.

The Court finds that precluding any party from introducing evidence related to the

spoliated body-camera video, including evidence of the existence of the body-camera video and

testimony from Capt. Carlson or any other witness about what body-camera video showed, is

appropriate and necessary to cure the prejudice caused by Defendants' spoliation of the body-

camera video. *See Europe*, 592 F. Supp. 3d at 180 (ordering preclusion of arguments based on

the content of spoliated electronic documents to "ensure[] that [the spoliating party] does not

benefit from its negligence"); *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 502

(S.D.N.Y. 2016) (ordering preclusion of evidence related to spoliated emails to "adequately

protect[] the [non-spoliating party] against any legal prejudice arising from the [spoliating

party's] conduct"). This preclusion order does not, however, include testimony from Defendant

Weir related to his observations that day. Relatedly, the Court will not consider evidence related

to the spoliated body-camera video in disposition of Defendants' motion for summary judgment.

Furthermore, Defendant Broome County and the Broome County Attorney's Office shall

jointly and severally bear the reasonable attorney's fees and costs Plaintiff and his counsel

incurred in connection with the spoliation of the body-camera video. *See Hughes*, 2021 WL

4295209, at *14, 2021 U.S. Dist. LEXIS 180064, at *36–37; *CAT3, LLC*, 164 F. Supp. 3d at

501–02.[11] Defendants, for their part, do not specifically address Plaintiff's request for fees and

costs at all. (Dkt. Nos. 32, 40.) "It is well-established that 'misconduct that causes a party to

incur additional expenses is a form of prejudice that supports an award of sanctions pursuant to

Rule 37(e).'" *Hughes*, 2021 WL 4295209, at *14, 2021 U.S. Dist. LEXIS 180064, at *36–37

(quoting *Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14-cv-1254, 2021 WL 1172265, at

*5, 2021 U.S. Dist. LEXIS 59661, at *15–16 (S.D.N.Y. Mar. 29, 2021)). Though Plaintiff is

represented by attorneys from Legal Services of Central New York, and therefore has

presumably not himself incurred additional expenses, his attorneys nevertheless "have been put

to the burden and expense of ferreting out the malfeasance and seeking relief from the Court."

---

[11] While the Court has imputed control over the spoliated evidence to all Defendants, the Court has "wide discretion to apportion Rule 37 monetary sanctions." *See Charlestown Cap. Advisors*, 337 F.R.D. at 69 n.19 (quoting *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16-cv-1318, 2017 WL 3671036, at *20, 2017 U.S. Dist. LEXIS 165702, at *56 (S.D.N.Y. July 18, 2017)); *see also Hughes*, 2021 WL 4295209, at *14–15, 2021 U.S. Dist. LEXIS 180064, at *36–40 (awarding attorney's fees and costs against the City of New York and its law department but not individual defendants). The Court imposes the monetary sanction against only Defendant Broome County and the Broome County Attorney's Office in recognition of the fact that Defendants Hrebin, Fowler, and Weir did not personally cause the destruction of the body-camera video and because levying the monetary sanction against Defendant Broome County and the Broome County Attorney's Office serves the purpose of sanctioning those primarily responsible for failing to ensure that Defendants' preservation obligations were met. *See id.*, 2021 WL 4295209, at *14, 2021 U.S. Dist. LEXIS 180064, at *37–38 (holding that where the New York City Law Department "fail[ed] to take effective steps to ensure that . . . ESI would be preserved," apportioning sanctions between the defendant City of New York and the Law Department was appropriate). The Court finds that "sanctioning [Defendant Broome County and the Broome County Attorney's Office] 'is necessary both to deter such conduct in the future as well as to compensate for the expenses [Plaintiff's counsel] w[as] forced to incur by [Defendant Broome County and the Broome County Attorney's Office's] . . . disregard in ensuring that [evidence preservation] obligations were being met.'" *See id. (*fourth, fifth, and eighth alterations in original) (quoting *Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14-cv-1254, 2019 WL 6838672, at *9, 2019 U.S. Dist. LEXIS 218286, at *27 (S.D.N.Y. Dec. 16, 2019)).

*See id.* (quoting *CAT3, LLC*, 164 F. Supp. 3d at 501). Awarding fees against Defendant Broome County and the Broome County Attorney's Office "serve[s] to 'enforce compliance with the discovery rules,'" *see Charlestown Cap. Advisors*, 337 F.R.D. at 68 (quoting *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1367 (2d Cir. 1991)) and "also serves as a deterrent to future spoliation," *see CAT3, LLC*, 164 F. Supp. 3d at 502, as it should alert Broome County and the Broome County Attorney's Office to a need to reevaluate their policies and procedures involving the storage and preservation of body-camera video footage and other electronically stored information that may be relevant to future litigation.

## IV.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all of Plaintiff's claims, (Dkt. No. 31, at 1; Dkt. No. 31-7, at 16), and argue that they are entitled to summary judgment because Plaintiff failed to exhaust administrative remedies and Defendants are entitled to qualified immunity, (Dkt. No. 31-7, at 4–5, 15–16). Aside from these arguments, Defendants include specific arguments only as to Plaintiff's claims for: (1) excessive force in violation of the Fourteenth Amendment against Defendants Hrebin and Fowler; (2) unreasonable search in violation of the Fourth Amendment against Defendants Hrebin, Fowler, and Weir; (3) negligent supervision and training against Defendant Broome County; and (4) state-law battery, assault, and intentional infliction of emotional distress under the theory of respondeat superior against Defendant Broome County. (Dkt. No. 31-7, at 6–15.) Plaintiff opposes Defendants' motion, arguing that he exhausted available administrative remedies and Defendants are not entitled to qualified immunity, (Dkt. No. 33, at 5–8, 10–11), and that Defendants are not entitled to summary judgment with regard to the following claims: (1) excessive force in violation of the Fourteenth Amendment against Defendants Hrebin and Fowler; and (2) state-law battery, assault, and

intentional infliction of emotional distress under the theory of respondeat superior against

Defendant Broome County, (*id.* at 8–12).[12]

## A.     Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if

all submissions taken together "show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A

fact is material if it "might affect the outcome of the suit under the governing law," and is

genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549,

553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The moving party bears the initial burden

of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The

moving party may meet this burden by showing that the nonmoving party has "fail[ed] to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan*

*v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is

appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a

reasonable juror to return a verdict in his or her favor on' an essential element of a claim"

---

[12] Plaintiff states that he "does not challenge Defendant[s'] summary judgment motion for the dismissal of his Fourth Amendment strip search claims and state law negligent hiring and supervision claim." (Dkt. No. 33, at 5 n.2.) Accordingly, the Court finds that Plaintiff has explicitly abandoned these claims, *see Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."), and Plaintiff's Fourth Amendment unreasonable search claim against Defendants Hrebin, Fowler, and Weir and state-law negligent hiring and supervision claim against Defendant Broome County are dismissed with prejudice. *See LaFever v. Clarke*, 525 F. Supp. 3d 305, 333 (N.D.N.Y. 2021) (dismissing claims that were abandoned on summary judgment); *Leavitt v. Ethicon, Inc.*, 524 F. Supp. 3d 360, 367 (D. Vt. 2021) (granting motion for summary judgment in light of the plaintiffs' "unequivocal abandonment of certain claims").

(quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))). If the moving

party meets this burden, the nonmoving party must "set forth specific facts showing that there is

a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24;

*Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In ruling on a motion for summary judgment,

"[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any

factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson

v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

   "When ruling on a summary judgment motion, the district court must construe the facts

in the light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d

775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is

some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the

true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins.

Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d

Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves

create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593

F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### B.   Discussion

#### 1.   Exhaustion of Administrative Remedies

   Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims

because Plaintiff failed to exhaust his administrative remedies with regard to these claims. (Dkt.

No. 31-7, at 4–5.) Specifically, Defendants argue that Plaintiff, after appealing a grievance

officer's denial of Plaintiff's grievance, failed to further appeal the Chief Administrative

Officer's decision to the Citizen's Policy and Complaint Review Council. (*Id.* at 5.) Plaintiff argues that by timely filing a grievance and appealing a first-level denial to the Chief Administrative Officer, who "accepted" his grievance, Plaintiff had no further available administrative remedies. (Dkt. No. 33, at 6–7.) Plaintiff also argues that, because he received a favorable outcome, he was not required under the PLRA to appeal further. (*Id.* at 7.)

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, prescribes limitations on an inmate's ability to bring civil actions with respect to prison conditions. Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), *abrogated on other grounds by Ross v. Blake*, 578 U.S. 632, 639–42 (2016).

Proper exhaustion of administrative remedies is dependent on the rules and regulations of the prison in which the grievance is filed; that is, an inmate of a county-level correctional facility must satisfy the requirements, including procedural and substantive requirements, specifically applicable to such facilities. *See Hayes v. Dahlke*, 976 F.3d 259, 268 (2d Cir. 2020) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." (alteration in original) (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007))).

Failure to exhaust available administrative remedies is an affirmative defense that must be raised by the defendants. *See Jones*, 549 U.S. at 216. Therefore, the defendants "bear the

initial burden of establishing the affirmative defense of non-exhaustion 'by pointing to "legally sufficient sources" such as statutes, regulations, or grievance procedures' which demonstrate that 'a grievance process exists and applies to the underlying dispute.'" *Williams v. Correction Officer Priatno*, 829 F.3d 118, 126 n.6 (2d Cir. 2016) (quoting *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015)). "If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors . . . rendered a nominally available procedure unavailable as a matter of fact." *Hubbs*, 788 F.3d at 59 (quoting *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004), *abrogated on other grounds by Ross*, 578 U.S. at 639–42).

The regulations governing grievance procedures at county-level correctional facilities in New York provide that "the chief administrative officer of each local correctional facility shall establish, implement and maintain a formal inmate grievance program," which "shall include," among other things, "a detailed description of grievance program operations including steps, timeliness, investigative processes and available internal and external appeal procedures," N.Y. Comp. Codes R. & Regs. tit. 9, §§ 7032.1, 7032.3(b). Under any facility's program, an inmate must "file a grievance within five days of the date of the act or occurrence giving rise to the grievance." *Id.* § 7032.4(d). The chief administrative officer of the facility designates a staff member to act as a grievance coordinator, *id.* § 7032.4(e), and the regulations provide that the chief administrative officer or designee shall "ensure that each grievance is investigated to the fullest extent necessary by an impartial person who was not personally involved in the circumstances giving rise to the grievance," *id.* § 7032.4(f). Within five business days of receipt, the "grievance coordinator shall issue a written determination." *Id.* § 7032.4(i). The inmate has two business days after receipt of the grievance coordinator's determination to appeal to the chief

administrative officer, *id.* § 7032.4(j), after which the chief administrative officer has five business days to issue a determination, *id.* § 7032.4(k). For "any grievance denied by the facility administrator," the inmate has three business days to indicate to the grievance coordinator that he seeks to appeal to the State Commission of Correction, and the grievance coordinator then has three business days to submit the appeal to the Commission's Citizens' Policy and Complaint Review Council ("CPCRC"). *Id.* § 7032.5.

As an initial matter, Defendants have failed to submit any evidence of the actual grievance program that the Facility has implemented. *See Hubbs*, 788 F.3d at 62 ("The burden . . . is on the defendant to establish at the outset that an administrative remedy . . . existed and covered the dispute at hand."). While it is undisputed that Plaintiff received "an inmate handbook" when he entered the Facility, (Dkt. No. 31-6, ¶ 53; Dkt. No. 31-10, at 34), which presumably included the Facility's grievance procedures, Defendants do not include any indication of what those procedures were. Nor do Defendants cite any "'statutes[ or] regulations . . .' which demonstrate that 'a grievance process exist[ed] and applie[d] to the underlying dispute.'" *See Williams*, 829 F.3d at 126 n.6 (2d Cir. 2016) (quoting *Hubbs*, 788 F.3d at 59). "Title 9 provides only the 'Minimum Standards and Regulations' that a county facility must implement in adopting a formal grievance program." *Dickinson v. York*, 828 F. App'x 780, 783 n.3 (2d Cir. 2020) (summary order); *see also* N.Y. Comp. Codes R. & Regs. tit. 9, § 7032.3. Thus, it is possible that the Facility's procedures are not coextensive with the Title 9 regulations. However, by failing to put forth any evidence of the Facility's specific regulations, Defendants have forfeited any argument based on those regulations. *See Dickinson*, 828 F. App'x at 783 n.3 (citing *Hemphill*, 380 F.3d at 686, 688–89). The Court will instead consider the issue of exhaustion in light of the Title 9 regulations alone. *See id.*

Here, it is undisputed that Plaintiff timely filed a grievance regarding the February 10, 2020 incident and timely appealed the initial denial of that grievance to the Chief Administrative Officer. (Dkt. No. 31-15, at 1, 10.) On February 20, 2020, the Chief Administrative Officer issued a determination on an inmate grievance form, checking a box that stated "Grievance Accepted." (*Id.* at 10–12.) The Chief Administrative Officer wrote that he "accepted the requested action," noting that Plaintiff's request for an investigation "has been granted and one is ongoing," Plaintiff "may call [his] lawyer at any time," and Plaintiff was interviewed regarding the incident. (*Id.*). Plaintiff "agree[d] to accept the decision." (*Id.*)

Defendants argue, however, that Plaintiff's acceptance of the Chief Administrative Officer's decision and failure to appeal the decision to CPCRC means that Plaintiff "failed to use all the steps of the Facility's grievance policy which resulted in his failure to exhaust his administrative remedies." (Dkt. No. 31-7, at 5.) But the governing regulations provide for an appeal of grievances *denied* by the facility administrator. The relevant regulation states that "[w]ithin three business days of the receipt of the chief administrative officer's determination, any grievant may appeal any grievance *denied* by the facility administrator in whole or in part" to the CPCRC. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 7032.5(a) (emphasis added).[13] The form on which the determination of the Chief Administrative Officer was issued similarly states that, "[p]ursuant to 9 NYCRR § 7032.5(a), any grievant may appeal any grievance DENIED by the facility administrator, in whole or in part, to the State Commission of Correction." (Dkt. No. 31-15, at 10 (emphasis in original).) The form further states that "a grievance accepted in its entirety by the Chief Administrative Officer . . . may not be appealed." (Dkt. No. 31-15, at 10).

---

[13] The grievance form provided, as an alternative to "Grievance Accepted," a determination of "Grievance Accepted in part/Denied in part." (Dkt. No. 31-15, at 10.)

Defendants do not cite any support for their assertion that, even though Plaintiff followed applicable regulations by timely filing a grievance, timely appealing a denial to the Chief Administrative Officer, and ultimately having his grievance "accepted" by the Chief Administrative Officer, Plaintiff was nevertheless required to appeal that outcome to the CPCRC. *Cf. Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004) (finding that "[o]nce [a DOCCS grievant] receive[s] a favorable ruling . . . , no further administrative proceedings [are] available to propel him out of stasis," and "[c]onsequently, there [is] no further 'possibility of some relief' for [the grievant]." (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001))). Defendants have not identified an available administrative remedy; under the language of the relevant regulation, Plaintiff was not permitted to appeal the "grievance accepted" determination ruling to the CPCRC.

In sum, because Plaintiff "complete[d] the administrative review process in accordance with the applicable procedural rules," which is "all that is required by the PLRA to 'properly exhaust,'" *see Jones*, 549 U.S. at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)), Plaintiff did not fail to exhaust available administrative remedies. Accordingly, Defendants' motion for summary judgment is denied to the extent it is premised on the argument that Plaintiff failed to exhaust administrative remedies.

### 2.    Excessive Force

Defendants argue that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment excessive force claim against Defendants Hrebin and Fowler because (1) any force used by Defendants Hrebin or Fowler while Plaintiff was being handcuffed was objectively reasonable due to Plaintiff's noncompliance, (2) Defendants Hrebin and Fowler did not use force on Plaintiff while he was in his cell, and (3) Plaintiff had not had any prior interactions with Defendants Hrebin and Fowler, and therefore, neither Defendant Hrebin nor Defendant Fowler

had a motive to use excessive force. (Dkt. No. 31-7, at 6–8.) Plaintiff argues that Defendants'

motion should be denied with respect to Plaintiff's excessive force claim against Defendants

Hrebin and Fowler because (1) there exist factual disputes about the alleged use of force, and (2)

familiarity with an alleged attacker is not an element of a Fourteenth Amendment excessive force

claim. (Dkt. No. 33, at 8–10.)

  The parties agree that, at the time of the events at issue, Plaintiff was a pretrial detainee at

the Facility. (Dkt. No. 31-7, at 6; Dkt. No. 33, at 8.) "[T]he right of pretrial detainees to be free

from excessive force amounting to punishment is protected by the Due Process Clause of the

Fourteenth Amendment." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999). To succeed on

a Fourteenth Amendment excessive force claim, "a pretrial detainee must show only that the

force purposely or knowingly used against him was objectively unreasonable." *See Kingsley v.

Hendrickson*, 576 U.S. 389, 396–97 (2015). That is, a plaintiff must first show that the defendant

used force "purposefully, knowingly, or (perhaps) recklessly." *See Edrei v. Maguire*, 892 F.3d

525, 534 (2d Cir. 2018) (citing *Kingsley*, 576 U.S. at 395–96). Then, the plaintiff must

demonstrate that the force was objectively unreasonable in light of "such factors as 'the

relationship between the need for the use of force and the amount of force used; the extent of the

plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the

severity of the security problem at issue; the threat reasonably perceived by the officer; and

whether the plaintiff was actively resisting.'" *See Frost v. N.Y.C. Police Dep't*, 980 F.3d 231,

252 (2d Cir. 2020) (quoting *Kingsley*, 576 U.S. at 397). "These non-exhaustive considerations

'inform the ultimate Fourteenth Amendment inquiry: whether the governmental action was

rationally related to a legitimate governmental objective.'" *Ransom v. Banks*, No. 20-cv-10232,

2022 WL 769344, at *3, 2022 U.S. Dist. LEXIS 45005, at *7 (S.D.N.Y. Mar. 14, 2022) (quoting *Edrei*, 892 F.3d at 536).

Because whether a use of force was objectively unreasonable is a fact-intensive inquiry that often involves assessments of credibility and choices between conflicting versions of events—questions that must often be left for a jury to decide—"granting summary judgment against plaintiffs on excessive force claims is rarely appropriate." *See Taylor v. Quayyum*, No. 16-cv-1143, 2023 WL 5293383, at *7, 2023 U.S. Dist. LEXIS 146503, at *21 (S.D.N.Y. Aug. 17, 2023) (quoting *Anderson v. City of N.Y.*, No. 16-cv-2583, 2019 WL 1426723, at *8, 2019 U.S. Dist. LEXIS 54126, at *21 (S.D.N.Y. Mar. 28, 2019)).

Here, there exist issues of material fact that preclude summary judgment. Plaintiff claims he did not resist during the initiation of the SERT shakedown or while Defendants Hrebin and Fowler handcuffed him. (Dkt. No. 33-1, ¶¶ 31, 33; Dkt. No. 31-10, at 45.) Defendants, meanwhile, claim that Plaintiff refused to "give up his hands to be handcuffed." (Dkt. No. 31-6, ¶¶ 31, 33; Dkt. No. 33-12, at 33–34; Dkt. No. 33-13, at 22.) Furthermore, Plaintiff claims that, while he was handcuffed in his cell, Defendants Hrebin and Fowler assaulted him. (Dkt. No. 33-1, ¶ 72; Dkt. No. 31-10, at 49–52.) Defendants claim no force was used in Plaintiff's cell. (Dkt. No. 31-6, ¶ 43; Dkt. No. 31-2, ¶ 4; Dkt. No. 31-3, ¶ 4; Dkt. No. 31-12, at 38; Dkt. No. 31-13, at 25–26.)

Whether Plaintiff was resisting at the onset of the SERT shakedown, in addition to itself being a factor relevant to the objective reasonableness of an alleged use of force, also bears on the severity of the security problem at issue and the threat reasonably perceived by Defendants Hrebin and Fowler at that point, *see Kingsley*, 576 U.S. at 397. Such a factual dispute is an issue to be decided at trial, not on a motion for summary judgment. *See Wright*, 554 F.3d at 266;

*Taylor*, 2023 WL 5293383, at *7, 2023 U.S. Dist. LEXIS 146503, at *21. And determining what occurred in Plaintiff's cell, which is wholly dependent on "assessments of credibility and choices between conflicting versions of the events," is a matter "for the jury, not for the [C]ourt on summary judgment." *See Simpson v. City of N. Y.*, 793 F.3d 259, 265 (2d Cir. 2015) (quoting *Jeffreys*, 426 F.3d at 553). Defendants' argument relying on Plaintiff's lack of "prior interactions with any Defendant or any reason to fear any Defendant" is unavailing; neither a preexisting relationship nor motive is an element of a Fourteenth Amendment excessive force claim. *See Kingsley*, 576 U.S. at 396–97; *Edrei*, 892 F.3d at 534.

Accordingly, Defendants' motion for summary judgment is denied with respect to Plaintiff's Fourteenth Amendment excessive force claim against Defendants Hrebin and Fowler.

### 3.      Qualified Immunity

Defendants argue that summary judgment with respect to Plaintiff's Fourteenth Amendment excessive force claim is appropriate because they are entitled to qualified immunity. (Dkt. No. 31-7, at 15–16.) Specifically, Defendants argue that no Defendant violated any clearly established law. (*Id.* at 16.) Plaintiff argues that Defendants are not entitled to qualified immunity because "factual disputes remain as to the reasonableness of [the force used]." (Dkt. No. 33, at 10–11 (alteration in original) (quoting *Smith v. Sawyer*, 435 F. Supp. 3d 417, 435 (N.D.N.Y. 2020)).)

"Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). On a motion for summary judgment, the court evaluates claims of qualified immunity using a two-part inquiry: (1) "whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right,'" and (2) "whether the right in question was 'clearly established' at the time of the violation," *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014)

(alterations in original) (first quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and then quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "Courts have discretion to decide the order in which to engage these two prongs." *Id.* at 656 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* (citations omitted).Here, as previously discussed, material factual disputes remain as to both the reasonableness of Defendants Hrebin and Fowler's use of force while handcuffing Plaintiff and whether Defendants Hrebin and Fowler used force while in Plaintiff's cell. Because these material factual disputes remain, deciding the issue of qualified immunity is inappropriate. *See Smith*, 435 F. Supp. 3d at 442; *see also Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder." (quoting *Kerman v. City of N.Y.*, 374 F.3d 93, 109 (2d Cir. 2004))); *Hemphill v. Schott*, 141 F.3d 412, 417–18 (2d Cir. 1998) (reversing the district court's finding of qualified immunity where there were factual disputes as to movements made by the plaintiff prior to the use of force and explaining that "summary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain"); *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 505 (N.D.N.Y. 2010) ("[I]t is impossible to 'determine whether [the defendant] reasonably believed that . . . force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded.'" (first, fourth, fifth, and sixth alterations in original) (quoting *Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999))). Accordingly, Defendants' motion for summary judgment on the basis of qualified immunity is denied.

### 4.      Battery, Assault, and Intentional Infliction of Emotional Distress

Despite seeking "an Order pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the Complaint," (Dkt. No. 31, at 1; *see also* Dkt. No. 31-7, at 16), Defendants include no argument about Plaintiff's claims for battery, assault, or intentional infliction of emotional distress against Defendants Hrebin, Fowler, and Weir in their memorandum of law in support of their motion for summary judgment. (Dkt. No. 31-7.) To the extent Defendants seek summary judgment on these claims on the grounds relied on in support of their motion with regard to Plaintiff's excessive force claim, the Court denies Defendants' motion for the reasons given above—namely, the existence of numerous issues of material fact. Otherwise, the Court construes Defendants' motion as not seeking summary judgment on Plaintiff's claims for battery, assault, or intentional infliction of emotional distress against Defendants Hrebin, Fowler, and Weir. *See 59th St. Assocs. v. Reliance Mediaworks Ltd.*, No. 14-cv-7435, 2016 WL 861212, at *1 n.1, 2016 U.S. Dist. LEXIS 28876, at *1 n.1 (S.D.N.Y. Mar. 4, 2016) ("None of the submissions in fact state on which counts 59th Street seeks summary judgment, but 59th Street makes no argument regarding Count Two. As we received no briefing on this claim, we assume that 59th Street does not seek judgment on it."); *Tubbs v. Venettozzi*, No. 19-cv-126, 2022 WL 7274397, at *2 n.6, 2022 U.S. Dist. LEXIS 128771, at *5 n.6 (N.D.N.Y. July 20, 2022) ("Defendant makes no argument as to why [the deliberate indifference] claim should be dismissed and so summary judgment should be denied as to it."), *report and recommendation adopted*, 2022 WL 4545542, 2022 U.S. Dist. LEXIS 176685 (N.D.N.Y. Sept. 29, 2022).

Defendants do, however, argue that Defendant Broome County cannot be liable under the theory of respondeat superior for Plaintiff's claims of battery, assault, and intentional infliction of emotional distress and that summary judgment on these claims against Defendant Broome County is therefore warranted. (Dkt. No. 31-7, at 13–15; Dkt. No. 36-1, at 5–7.) Specifically,

Defendants argue that Defendant Broome County "is not liable for the acts of its correctional officers or sergeants" because "Broome County has not adopted a local law expressly assuming responsibility for the actions of its correctional officers or sergeants." (Dkt. No. 31-7, at 13.) Plaintiff argues that Defendant Broome County is liable for these claims under the doctrine of respondeat superior. (Dkt. No. 33, at 11–12.)[14]

"New York law is clear that 'counties are generally not liable for tortious acts other than negligence committed by a Sheriff or his or her deputies without a legislative assumption of liability.'" *Casiano v. Ashley*, 515 F. Supp. 3d 19, 28 (W.D.N.Y. 2021) (quoting *Nolan v. Cnty. of Erie*, No. 19-cv-1245, 2021 WL 51004, at *7, 2020 U.S. Dist. LEXIS 246418, at *20 (W.D.N.Y. Jan. 6, 2021)); *see also Barr v. Albany Cnty.*, 50 N.Y.2d 247, 257 (1980) ("[A] county may, by legislative enactment, assume responsibility for the tortious acts of its Deputy Sheriffs as distinguished from the acts of the Sheriff himself."). Plaintiff suggests that Defendants Hrebin, Fowler, and Weir are employees of Broome County and not employees of the Broome County Sheriff. (Dkt. No. 33, at 12.) But he provides no factual support for this proposition.[15] And the caselaw Plaintiff cites does not support the proposition that corrections officers employed by a county sheriff are not agents of the sheriff. *See Smelts v. Meloni*, 762 N.Y.S.2d 467, 467–68 (2003) (finding that sheriff's deputies are not "employees" of the county for the purposes of respondeat superior liability)).) In fact, the Charter and Code of the County of

---

[14] Defendants also argue that "any § 1983 claims asserted against the County should be dismissed" because Plaintiff has failed to establish Broome County's *Monell* liability. (Dkt. No. 31-7, at 13–15.) Plaintiff notes in response that he has "not brought any Section 1983 claims" against Broome County, (Dkt. No. 33, at 5 n.2), and the Court therefore does not address Defendants' argument about *Monell* liability. *See Jackson v. Cnty. of Ulster*, No. 22-cv-148, 2022 WL 2954370, at *10, 2022 U.S. Dist. LEXIS 132123, at *29 (N.D.N.Y. July 26, 2022) ("The only [federal] claim in the [complaint] is against [an individual defendant] . . . . Thus, there is no reason for the Court to determine whether a *Monell* liability claim could be sustained against the County . . . .").

[15] In fact, the record demonstrates that each of these Defendants testified that he is employed by the Broome County Sheriff's Office. (Dkt. No. 31-2, ¶ 1; Dkt. No. 31-3, ¶ 1; Dkt. No. 31-11, at 9; Dkt. No. 31-12, at 14–15; Dkt. No. 31-13, at 11,13.)

Broome[16] ("Broome County Code") makes clear that the Broome County Sheriff "appoint[s] corrections officers . . . as may be necessary to operate the County jail facilities," Broome County Code § A2304(D), thus rendering corrections officers, as with deputies, agents of the Broome County Sheriff, *see Douglas v. Cnty. of Oswego*, 573 N.Y.S.2d 236, 237 (Sup. Ct. 1991) ("A county's immunity from vicarious liability for the negligent acts of a sheriff is extended to the negligent acts of deputy sheriffs acting in the course of their duties as well as to the employees and jail personnel employed by the sheriff . . . ." (citations omitted)); *cf. Wilson v. Sponable*, 439 N.Y.S.2d 549, 555 (App. Div. 1981) (explaining that, historically, "sheriff's deputies were agents of the sheriff and had no independent common law agency relationship with the county" and that that relationship formed the basis of the "effective[] immuniz[ation] [of] the counties from the negligent acts of the Deputy Sheriffs as well as those of the Sheriff"). Thus, Defendant Broome County could be liable for the tortious acts of Defendants Hrebin, Fowler, and Weir only if it "assume[d] responsibility for the[ir] tortious acts" by express "legislative enactment." *See Barr*, 50 N.Y.2d at 257; *see also Nichols v. Rensselaer Cnty.*, 517 N.Y.S.2d 315, 317 (App. Div. 1987) ("[T]he Court of Appeals [in *Barr*] instructs us that the key factor in determining whether a county has waived its immunity for tortious acts of its Deputy Sheriffs is the county's express willingness to assume responsibility for those acts.").

Plaintiff argues that Defendant Broome County has done so through its "Liability and Casualty Fund," (Dkt. No. 33, at 12,) which provides payments for judgments, settlements, and expert or professional services rendered in connection with "claims . . . that arise out of acts and

---

[16] Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the Charter and Code of the County of Broome, available at https://www.gobroomecounty.com/sites/default/files/dept/legis/Charter%20and%20Code/ Broome%20County%20Code_v13.pdf. *See Morris Motel, LLC v. DeChance*, No. 20-cv-3350, 2023 WL 2682937, at *1 n.2, 2023 U.S. Dist. LEXIS 54101, at *2 n.2 (E.D.N.Y. Mar. 29, 2023) (collecting cases and taking judicial notice of the online version of a town code in deciding a motion for summary judgment).

omissions of . . . employees . . . of the County of Broome or the Broome County Sheriff," Broome County Code §§ 130-1, 130-4. But indemnification alone, absent an explicit waiver of immunity, is insufficient to impose liability on Defendant Broome County for the acts of Defendants Hrebin, Fowler, and Weir. *See Nichols*, 517 N.Y.S.2d at 317 ("We are unable to find any [express] assumption of responsibility [by Rensselaer County] in the instant case. Indeed, [local law] simply provides for the indemnification of County employees for the amount of judgments against them or for the amount of any settlement." (citations omitted)); *see also Saleh v. Savage*, No. 12-cv-468S, 2015 WL 1608839, at *7–8, 2015 U.S. Dist. LEXIS 47166, at *19– 21 (W.D.N.Y. Apr. 10, 2015) (dismissing state-law claims against a county defendant where a local law "provid[ed] for the indemnification of its employees for actions taken in the course of their employment" but the record lacked any indication that the county had "expressly assume[d] liability for the acts of its sheriff and deputies"); *cf. Barr*, 50 N.Y.2d at 256 (finding a county had expressly assumed liability for the acts of sheriff's deputies where local law provided that "[a]ny act or omission of any employee of the county in the office of the sheriff, done or made in the performance of an official duty shall be the act or omission of the county").

Accordingly, summary judgment as to Plaintiff's claims of battery, assault, and intentional infliction of emotional distress against Defendants Hrebin, Fowler, and Weir is denied, and summary judgment as to Plaintiff's claims of battery, assault, and intentional infliction of emotional distress against Defendant Broome County is granted.

## V.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for sanctions, (Dkt. No. 30), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that the parties are precluded from introducing evidence related to the spoliated body-camera video; and it is further

**ORDERED** that Defendant Broome County and the Broome County Attorney's Office shall jointly and severally bear the reasonable attorney's fees and costs Plaintiff and his counsel incurred in connection with the spoliation of the body-camera video; and it is further

**ORDERED** that Plaintiff shall submit, by October 19, 2023, a declaration detailing the attorney's fees and costs associated with Plaintiff's motion for sanctions for which Plaintiff seeks recovery, a memorandum of law, not to exceed 15 pages, supporting Plaintiff's request, and any supporting documentation; Defendants may submit, by November 2, 2023, objections to Plaintiff's request; and it is further

**ORDERED** that Plaintiff's motion for sanctions is otherwise **DENIED**; and it is further

**ORDERED** that Defendants' motion for summary judgment, (Dkt. No. 31), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiff's Fourth Amendment unreasonable search claim against Defendants Hrebin, Fowler, and Weir and state-law claims for negligent hiring and supervision, battery, assault, and intentional infliction of emotional distress against Defendant Broome County are **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk is respectfully directed to terminate Defendant Broome as a party to this action; and it is further

**ORDERED** that Defendants' motion for summary judgment is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>September 28, 2023</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge